Argued November 28, affirmed December 15, 1972

STATE OF OREGON, *Respondent, v.* JESSIE T.
HODGE (No. C-71-09-2938), *Appellant.*

504 P2d 143

*Mark McCulloch,* Portland, argued the cause and filed the brief for appellant.

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and THORNTON, Judges.

SCHWAB, C.J.

Defendant appeals from a conviction upon trial to the court without a jury of possession of a narcotic drug, heroin. Former ORS 474.020. One of the issues presented on appeal is whether or not the state established a sufficient chain of custody of the narcotic allegedly found on the defendant. There is no merit to the defendant's contention that the state did not, and a discussion of it is not warranted beyond noting that the principle involved is dealt with in detail in *State v. Anderson,* 242 Or 368, 409 P2d 681 (1966), and *State v. Winslow,* 3 Or App 140, 472 P2d 852 (1970).

The other issue is whether the police had probable cause to arrest the defendant. The police activity which led to the arrest and conviction of the defendant commenced when a Portland police officer was notified by a reliable informant[1] that the defendant was in

---

[1] Defendant concedes that the informant had proven himself to be reliable. The uncontroverted testimony of the officer was that the informant had given him information concerning nar-

possession of a large quantity of heroin stored in a particular place on her body, that she was riding in a green Riviera automobile belonging to one Johnnie Faye Park, and that the defendant would be getting rid of the heroin shortly.

At the time the officer received this information from the informant he had already received, some 48 hours before, information from another reliable informant that the defendant had a large amount of heroin, and that she was distributing it. At this time the officer also knew from a recent investigation that Johnnie Faye Park was "a dealer of heroin," and that "her residence was used as a stash pad or cutting pad for heroin dealers." Although the officer did not precisely so state, it is clear from his testimony that the investigation he was referring to was an investigation conducted by the Portland police department. He also knew from his own observation that Johnnie Faye Park operated an automobile which met the informant's description.

Upon receipt of the information from his informant the officer immediately proceeded to the residence of Johnnie Faye Park. He found defendant sitting in Park's automobile in front of the residence. He immediately placed defendant under arrest for illegal possession of narcotics and "advised her of her Constitutional rights." He did not search her, because it is the practice to take an arrested female to the police station for search by a police matron. En route to the police

cotics traffic during the previous nine months which resulted in about 20 arrests, 18 convictions and 25 to 30 seizures of narcotics and dangerous drugs. The officer also testified that he had never received information from this informant which he subsequently found to be untrue.

station defendant asked what was going to happen and the officer told her she was going to be searched at the station. Shortly before arriving at the police station defendant voluntarily gave a package, which she had secreted on her body, to the officer, which contained heroin.

The officer concedes that he did not ask the informant the basis of his knowledge, stating in response to a question during a hearing on the motion to suppress:

"* * * Because the information was so pointed and direct and then, together with my prior experiences with this informant, I didn't feel at this time that it was necessary for me to pursue that particular point any further.

"The information was so exacting, I—I just took it at face value."

■ Defendant correctly argues that generally speaking reasonable cause to arrest and reasonable cause to search are synonymous. She then argues that under the doctrine enunciated in *Aguilar v. Texas,* 378 US 108, 84 S Ct 1509, 12 L Ed 2d 723 (1964), information from an informant is not sufficient basis for a search unless the information from the informant included some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it to be.

■ *Spinelli v. United States,* 393 US 410, 89 S Ct 584, 21 L Ed 2d 637 (1969), interprets *Aguilar* as not in every instance requiring information from the informant as to the underlying circumstances. *Spinelli* recognizes that even under the *Aguilar* test it is not necessary that there be a statement as to how the information was gathered if the information describes

the accused's criminal activity in such detail as to be susceptible of a reasonable inference that the informant had gained his information in a reliable way:

> "The detail provided by the informant in Draper v. United States, 358 US 307, 3 L Ed 2d 327, 79 S Ct 329 (1959), provides a suitable benchmark. While Hereford, the Government's informer in that case, did not state the way in which he had obtained his information, he reported that Draper had gone to Chicago the day before by train and that he would return to Denver by train with three ounces of heroin on one of two specified mornings. Moreover, Hereford went on to describe, with minute particularity, the clothes that Draper would be wearing upon his arrival at the Denver station. A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way * * *." 393 US at 416.

■ In the present case, as the facts set forth above disclose, there was such detail. Furthermore, not only did the informant have a long history of reliability with the arresting officer, but the arresting officer was able to corroborate many of the details supplied to him by the informant before making the arrest.

Affirmed.